# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIMOTHY E. GIBLIN,  )
WILLIAM J. STROUP, deceased,  )
)
      Plaintiff  )
)  Civil Action No. 09-218
      v.  )
)
MICHAEL J. ASTRUE,  )
Commissioner of Social Security,  )
)
      Defendant  )

## **MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

### I. INTRODUCTION

Timothy E. Giblin ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Child's Insurance Benefits ("CIB") as the alleged surviving son of deceased wage earner William J. Stroup ("Stroup") under Title II of the Social Security Act, 42 U.S.C. §§ 401- 433 ("Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 9, 11). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is GRANTED; Defendant's Motion for Summary Judgment is DENIED; and, the decision of the Administrative Law Judge, Malvin B. Eisenberg ("ALJ"), is REVERSED and the case remanded to the Commissioner with directions to award benefits to Plaintiff.

### II. PROCEDURAL HISTORY

Stroup filed for Disability Insurance Benefits ("DIB") under Title II of the Act on July 25, 2000 (AR 58-60).[1] Stroup was awarded DIB following an administrative hearing on June 4, 2003 (AR 25-32). Plaintiff filed for CIB with the Social Security Administration ("SSA")

---

[1] Citations to Docket. Nos. 5 - 5-1, the Record, *hereinafter*, "AR."

1

January 5, 2005, claiming eligibility due to his alleged father - Stroup's - entitlement to DIB at the time of his death on December 4, 2004 (AR 74-76). Plaintiff was initially denied CIB by the SSA on July 25, 2005, because of insufficient proof of paternity (AR 12). A hearing before the ALJ to review the initial denial was conducted by video conference on April 16, 2007, and Plaintiff appeared before the ALJ represented by counsel (AR 366-405). Three witnesses for Plaintiff - Nancy Carol Giblin ("Giblin"), Jim L. Mong ("Mong"), and Thomas Lee Ul ("Ul") - were present to testify (AR 366-405). The ALJ issued his decision denying CIB to Plaintiff on May 4, 2007 (AR 12-18). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on June 26, 2009, thereby making the decision of the ALJ the final decision of the Commissioner (AR 5-7).

Plaintiff filed his Complaint in this Court on August 21, 2009. Defendant filed his Answer on November 3, 2009. Cross-motions for Summary Judgment followed.

### III. LEGAL STANDARD

When reviewing a decision denying benefits under Title II, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3rd Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

## IV. EVIDENTIARY RECORD

Plaintiff was born January 19, 1988 (AR 371). At the time of the administrative hearing, Plaintiff was 19 years old and a freshman at Westminster College (AR 371-372). Stroup, the Plaintiff's alleged father, was born July 19, 1946 (AR 58). Stroup applied for DIB, and claimed a disabling condition as of November 1, 1999 (AR 58). Stroup was awarded DIB on June 4, 2003, for heart-related ailments and post traumatic stress disorder (AR 25-32). Stroup served in the United States military from January 19, 1965 until January 17, 1969 (AR 58). Stroup died December 4, 2004 (AR 74-76).

At the administrative hearing held April 16, 2007, Plaintiff appeared to testify with his mother, Giblin, and two of Stroup's friends, Mong and Ul (AR 366). During his testimony, Plaintiff recalled first meeting Stroup at around age 10 when Stroup's mother took Plaintiff to visit Stroup, and informed Plaintiff that Stroup was his father (AR 372-374). Plaintiff testified that at that point Stroup acknowledged being Plaintiff's father (AR 374). Plaintiff stated that his relationship with Stroup was typically limited to visits during holidays and birthdays, though Stroup often went to school events, as well (AR 374-375). Plaintiff testified that he and Stroup generally spent time together at least once a month (AR 377). Plaintiff claimed that he always referred to Stroup as "dad" (AR 376). Plaintiff referred to Stroup's mother as "Grandma Dodd" (AR 372). Plaintiff testified that he was aware that the portion of his birth certificate that normally indicated the identity of one's father was left blank (AR 379). Plaintiff was aware of no other person who had ever claimed to be his father (AR 379).

Giblin testified following Plaintiff (AR 381). Giblin testified that she had never been married and had only one child - Plaintiff (AR 382). Giblin testified that she had lived with Stroup twice: once, for several weeks, and a second time, for almost a year ending when Plaintiff was born (AR 384). Giblin claimed to have had sexual relations with no one other than Stroup during the relevant time period and testified that only Stroup could have been Plaintiff's father (AR 384). Giblin also explained that Stroup's name was not included on Plaintiff's birth certificate only because he did not wish to take on the responsibility of being a father, and because Giblin was advised by an attorney that Stroup could go after her for money and/or

3

custody down the road (AR 385). Giblin testified that on the day of Plaintiff's birth, Stroup and his mother came to visit her in the hospital, and that Stroup continued to visit and call her at the hospital throughout her ten day stay (AR 385).

Giblin stated that Stroup first met Plaintiff when he was only 5 years old, and attended a school function with Plaintiff when he was in first grade (AR 386). However, she believed that Plaintiff did not come to the realization that Stroup was his father until some time later when Plaintiff specifically asked her about Stroup (AR 386). Giblin testified that Plaintiff was invited to functions on Stroup's side of the family, Plaintiff appeared with other family members in numerous photographs, and Stroup actively attended Plaintiff's school functions and athletic events (AR 386-387; 392).

Giblin stated that Stroup was initially uncomfortable with Plaintiff referring to him as "dad" when Plaintiff was younger because he did not want the responsibility of a family (AR 387). Giblin claimed that she never wanted to live with Stroup, and never wanted to pursue custody and support in court because she felt there was no reason to do so (AR 387-388). Giblin stated that although Stroup worked, he drank significantly, managed his money very poorly, and relied on her to pay his bills when they lived together (AR 388). Giblin testified that Stroup had personal difficulties, and was not able to cope well with many everyday events - particularly interruptions with his daily routine (AR 386-387). Giblin stated that Stroup's siblings were responsible for putting his death notice in the newspaper (AR 390).

Stroup's long-time friend, Mong, also offered testimony at the hearing (AR 395). Mong stated that he and Stroup had been friends from 1960 until the day Stroup passed away in 2004 (AR 395-396). The two were particularly close over the last ten years - Stroup visiting Mong's home to play pool four or five days a week (AR 396). Mong testified that Stroup frequently asked him questions or asked for advice about Plaintiff, because Mong had two older sons (AR 396). Mong first became aware that Stroup had a son about fifteen years prior, when Stroup asked him what he would buy his sons, because Stroup was looking for a present for his son, "Tim" (AR 397). Mong had already known Plaintiff, because he knew Stroup's mother and Giblin, and had seen Plaintiff since he was a baby (AR 398). Mong recounted several

4

conversations in which Stroup directly and indirectly referred to Plaintiff as his son (AR 398). He also recounted a particular occasion when Stroup was building Plaintiff a playhouse at Stroup's home (AR 398).

Ul testified that he had been friends with Stroup since high school (AR 400). Ul testified that they were "best of friends," and that he had been in the hospital with Stroup the day before he died (AR 400). Over the years, Ul and Stroup had lived and worked together, and more recently would see each other at least once a month (AR 401). Ul recounted that after Giblin became pregnant, Stroup claimed that the child was his (AR 401). He also remembered that when he went to visit Giblin in the hospital after Plaintiff's birth, Stroup said, "Timmy's here, I'm a father" (AR 401). Ul also testified that Stroup had built Plaintiff a playhouse with a sign, "Tim's Place," on it (AR 401).

Ul stated that one day Plaintiff asked Stroup if he was his father (AR 401). Stroup recounted to Ul afterwards that he told Plaintiff that he was his father (AR 401). Ul testified that Plaintiff was about 6 or 7 years old at the time (AR 402). Ul stated that he thought he heard Stroup had willed everything he had to Plaintiff when he died (AR 402). He also testified that if no such will existed, he would not have been surprised; Stroup was an eccentric individual and preferred living alone in the woods (AR 403). Ul believed that Stroup struggled psychologically after his service in Vietnam (AR 403). When the ALJ questioned Ul about Stroup's failure to acknowledge that he had children eligible for DIB on his benefits application, Ul stated that money was very tight for Stroup and he probably feared losing a portion of any benefits to which he may have been entitled (AR 403).

Plaintiff also submitted a variety of documents in support of his claim that Stroup was his biological father. These include a Certificate of Grant of Letters from the Register of Wills of Warren County, Pennsylvania, naming Plaintiff's mother - Giblin - as administratrix of Stroup's estate (AR 135-137). Renunciations made by Stroup's two surviving siblings were also provided, stating, "I also renounce and release any and all interest that I may have in this estate and/or any assets of the estate in favor of my brother's son, Timothy E. Giblin" (AR 127-128). These renunciations were signed and dated by Stroup's sister, Janet E. Scott, and Stroup's

5

brother, Paul T. Stroup, on June 30 and June 28, 2005, respectively (AR 127-128). Stroup's assets were valued at approximately $15,000.00 (AR 136).

Also provided was a Christmas card signed, "Dad," and allegedly handed to Plaintiff by Stroup, though no date is provided and there is no other indication that the letter was from Stroup (AR 129). Numerous other cards from Plaintiff's alleged grandmother, Evelyn Dodd, were also provided; each card included the envelope with return address, and was signed inside by "Gram Dodd," "Gramma Dodd," and "Grandma Dodd" (AR 161-174). Also provided were signed, postmarked cards with return addresses from, "Aunt Janet," and, "Uncle Chuck" (AR 180-184).

Finally, William J. Stroup's obituary from December 6, 2004 was also provided, and indicated that he was survived by a son, "Timothy Giblin" (AR 132). Three dozen labeled photographs were presented which showed Plaintiff interacting with Stroup's family and Stroup, himself (AR 185-192).

Following the hearing, in his decision dated May 4, 2007 the ALJ made the following findings:

1. The [Plaintiff] is not the "child" of the wage-earner under Pennsylvania law as required by section 216(h)(2)(A) of the Social Security Act;

2. The [Plaintiff] is not the "child" of the wage-earner pursuant to section 216(h)(2)(B) of the Social Security Act as his mother and the wage-earner never went through a marriage ceremony; and,

3. The [Plaintiff] is not the "child" of the wage-earner pursuant to section 216(h)(3)(C) of the Social Security Act as the evidence of record does not establish that the wage-earner was ever: decreed by a court to be his father, ordered by a court to contribute to his support, or acknowledged him in writing. Furthermore, the evidence of record does not establish that the wage-earner was his biological father or that the wage-earner was either living with him or contributing to his support at the time of his death.

(AR 18). The ALJ accordingly concluded that the Plaintiff was not entitled to CIB under the Act (AR 18).

## V. Discussion

The Social Security Act provides that every "child" of an individual who dies fully or

6

currently insured under the Act is entitled to CIB if the child who has applied for such benefits is unmarried, under the age of 18, and was dependent upon the insured individual at the time of the insured's death. 42 U.S.C. §§ 402(d) and 416(h). Dependency is presumed if the parent is living with or contributing to the support of the child. 42 U.S.C. § 402(d)(3). Here, the Plaintiff relies primarily on § 416(h)(2)(A), which states that, in determining whether an individual is a "child" for Social Security purposes, the Commissioner "shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual ... was domiciled at the time of his death."

Pennsylvania rules for intestate succession for person's born out of wedlock are governed by 20 Pa.C.S. § 2107, which provides, in pertinent part:

> **(c) Child of father.**–For purposes of descent by, from and through a person born out of wedlock, he shall be considered the child of his father when the identity of the father has been deemed determined in any one of the following ways:
>
> (1) If the parents of a child born out of wedlock shall have married each other.
>
> (2) If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds the child out to be his and provides support for the child which shall be determined by clear and convincing evidence.
>
> (3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

20 Pa.C.S. § 2107(c).

I find for the reasons more fully set forth below, that the Plaintiff produced clear and convincing evidence under 20 Pa.C.S. § 2107(c)(3) that Stroup was his father and that the ALJ's decision to the contrary is not supported by substantial evidence.

"Clear and convincing evidence" is required in order to establish paternity pursuant to § 2701(c)(3). This standard requires that "witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It

7

is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth." *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010). "'Clear and convincing evidence' is the highest burden in our civil law and requires that the fact-finder be able to 'come to clear conviction, without hesitancy, of the truth of the precise fact at issue.'" *In re Estate of Heske*, 647 A.2d 243, 244 (Pa. Super. 1994) (citations omitted).

      The ALJ found that while Stroup "may have given certain family members and a friend the impression that he was [the Plaintiff's] father," he was "not persuaded that overall there [was] clear and convincing evidence under the ... Act and regulations that [Stroup] was in fact his father" (AR 17). In finding that the Plaintiff failed to meet his burden, the ALJ found it significant that Stroup's DIB application failed to list the Plaintiff as his son (AR 16). The ALJ also cited Giblin's testimony that Stroup requested she omit his name from the Plaintiff's birth certificate (AR 16). He further found it significant that Giblin never "attempted" to marry Stroup, and that she never sought a court determination regarding support, custody, or paternity (AR 17). The ALJ determined that Giblin failed to provide any reasoning for her decision not to pursue these options (AR 17). The ALJ also found that Stroup never provided support or a place for the Plaintiff to live, and there was no evidence that he ever visited Stroup at his residence (AR 17). The ALJ also made note that the record lacked evidence of school records establishing Stroup as the Plaintiff's father, or any evidence that the Plaintiff was named a beneficiary on any life or health insurance policies (AR 17). Finally, the ALJ found it significant that Stroup made no specific provision in a will for the Plaintiff's benefit, and that his last writing attempting to divide his estate failed to mention the existence of any children (AR 17).

      In concluding that the Plaintiff's evidence fell short of the clear and convincing standard, the ALJ based his decision on several inaccurate findings that were not supported by the record. For instance, as previously discussed, the ALJ erroneously concluded that Giblin had failed to deny she had sexual relations with any one other than Stroup prior to the Plaintiff's birth (AR 15). Giblin in fact testified as follows:

> [Attorney]: ... I'm assuming you were having sexual
> relations with Mr. [Stroup]?

8

> [Ms. Giblin]: Yes, we were.
>
> [Attorney]: Do you have any such relationship with any other man?
>
> [Ms. Giblin]: No.
>
> [Attorney]: Okay. Is there any question in your mind as to who the father of [Plaintiff] is?
>
> [Ms. Giblin]: Mr. [Stroup] is definitely the father.

(AR 384). The ALJ further acknowledged that the Plaintiff was listed as Stroup's son in his obituary, but found that the record was devoid as to the source of that information (AR 16). To the contrary, Giblin testified that Stroup's siblings were responsible for providing the information for the obituary (AR 390).

Similarly, the ALJ found that Stroup never told Mong the identity of his son (AR 16). Again, there is no support for this finding in the record. Mong clearly testified at the hearing that Stroup once asked him what he would buy his sons for Christmas because "he was shopping for his son, Tim ..." (AR 397). Mong further testified to several conversations in which Stroup directly referred to the Plaintiff as his son (AR 398-399).

Moreover, the ALJ's findings were based upon a selective review of the evidence. While the ALJ found it significant that Stroup was not listed as the father on the Plaintiff's birth certificate and that Giblin failed to pursue support and/or paternity proceedings without explanation (AR 16-17), he ignored Giblin's testimony that she and Stroup agreed that he should not be listed on the birth certificate because he could not handle the responsibility of being a father (AR 387-389). Also ignored by the ALJ was Giblin's explanation that she saw no point in pursuing support and/or paternity because Stroup was irresponsible, had emotional troubles, could barely support himself, and might have pursued her for money (AR 388). Giblin further testified that she had, in fact, wanted to marry Stroup, but that he did not want marry her (AR 387).

In addition, the ALJ failed to discredit, in any meaningful way, the testimony of the two disinterested witnesses in this case, Mong and Ul. As indicated, the ALJ's recitation of Mong's testimony was factually incorrect, and the ALJ merely recited the substance of Ul's testimony

9

without engaging in any specific credibility analysis. Both of these individuals were long time friends of Stroup, had no financial interest in the outcome of this matter and testified unequivocally that Stroup acknowledged his paternity to them on many different occasions over the years. The ALJ did not indicate that these witnesses lacked credibility, or point to any other testimony that would have contradicted theirs. *See e.g., Anderson v. Bowen,* 1986 WL 9500 at *3 (E.D.Pa. 1986) (ALJ failed to explain why he rejected the affidavits of the alleged father's friends which stated he was the father of the child); *Fuller v. Schweiker*, 1983 WL 44256 at *4 (E.D.Pa. 1983) (while the ALJ pointed to several purported deficiencies in the evidence relating to paternity, the ALJ failed to state which testimony he found not to be credible).

In addition, the ALJ pointed to no contradictory evidence to rebut Giblin's contention that Stroup was the only man she had sexual relations with during the relevant time period. I also note that the following evidence stands essentially uncontradicted: Stroup's mother informed the Plaintiff that Stroup was his father and she frequently sent cards to the Plaintiff wherein she referred to herself as the Plaintiff's grandmother (AR 372-373); Stroup's siblings sent cards to the Plaintiff, signed statements averring that the Plaintiff was Stroup's son, and listed the Plaintiff as Stroup's son in his obituary (AR 390); and Ul and Mong, both good, long-standing friends of Stroup, testified that Stroup identified the Plaintiff as his son to both of them and built a playhouse for the Plaintiff (AR 395-398; 399-401).

The ALJ placed great significance on the fact that Stroup failed to list the Plaintiff as his son on his DIB application. As held by the court in *Morales v. Bowen*, 833 F.2d 481, 488 (3rd Cir. 2004) however, "a single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence." In *Morales*, the court found that there was not substantial evidence to support an ALJ's finding of non-paternity based on several factors similar to those in the present case. The child's mother in *Morales* testified she lived with the alleged father while she was pregnant and did not have sexual relations with any other men. In addition, there was evidence in that case that other family members acknowledged the paternity of the father in question, and numerous photographs of the child and his alleged father

were introduced. *Id.* at 487. The *Morales* court concluded that the father's refusal to acknowledge paternity in a formal manner and the fact that he never married the child's mother did not meaningfully tip the evidentiary scale.[2]

In sum, I find that the ALJ's conclusion that the Plaintiff failed to establish paternity by "clear and convincing" evidence is not substantially supported by the record given the factual errors by the ALJ discussed above and the overwhelming uncontradicted evidence of paternity. *See e.g., Black v. Bowen,* 1988 WL 252015 (W.D.Pa. 1988) (finding clear and convincing standard met where plaintiff provided, *inter alia*, uncontradicted testimony of her relationship with the alleged father corroborated by other witnesses testimony); *Lawrence v. Bowen,* 1986 WL 14542 (E.D.Pa. 1986) (finding that paternity was established by clear and convincing evidence where the evidence submitted showed that the plaintiff's relationship with the alleged father was exclusive during the period of conception, he never denied paternity and in fact admitted paternity to his family, and his family accepted and treated the child as a member of the family); *Jackson v. Bowen,* 1986 WL 98631 (M.D.Pa. 1986) (finding paternity was established where the plaintiff testified as to the exclusive nature of their relationship, family members testified that alleged father acknowledged paternity and the alleged father frequently visited the child). Because the record in this case is fully developed, the Plaintiff's Motion for Summary Judgment will be granted and the Defendant's Motion for Summary Judgment will be denied; the decision of the ALJ will be reversed and the case shall be remanded to the Commissioner with directions to award benefits to the Plaintiff.

## VI. CONCLUSION

An appropriate Order follows.

---

[2] Although the New Jersey statute required that paternity be established by a preponderance of the evidence as opposed to a clear and convincing standard under Pennsylvania law, I find, for the reasons discussed above, that the clear and convincing standard has been met here.

11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY E. GIBLIN,<br>WILLIAM J. STROUP, deceased,<br><br>        Plaintiff<br><br>        v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant | Civil Action No. 09-218 |

## ORDER

AND NOW, this 22nd day of September, 2010, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 9] is GRANTED, the decision of the ALJ is REVERSED, and JUDGMENT is hereby entered in favor of the Plaintiff, Timothy E. Giblin, and against the Defendant, Michael J. Astrue, Commissioner of Social Security.

IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment [Doc. No. 11] is DENIED and the case is hereby REMANDED to the Commissioner with directions to award benefits to the Plaintiff.

The clerk is hereby directed to mark the case closed.

                                                                                 s/ Sean J. McLaughlin<br>
                                                                                 United States District Judge

cm: All parties of record.